RIVER DOCKS, INC., ET AL                    CIVIL ACTION

VERSUS                                      NO.  08-689

J. GERBER, INC., ET AL                      SEC. "B"(3)

## ORDER AND REASONS

Before the Court are Defendant Helis Oil & Gas Company's Motion for Summary Judgment (Rec. Doc. 15), Plaintiffs' Cross-Motion for Summary Judgment on Third-Party Beneficiary Status of Barge Owners (Rec. Doc. 18), and Plaintiffs' and Defendant/Cross Claimant J. Gerber, Inc.'s Motion for Summary Judgment on Charter Hire (Rec. Doc. 45). All motions are opposed. (Rec. Docs. 29, 40, 47, 49). After review of the pleadings and applicable law, and for the reasons that follow,

IT IS ORDERED that Defendant Helis's Motion for Summary Judgment (Rec. Doc. 15) is GRANTED and that Plaintiffs' Cross Motion for Summary Judgment (Rec. Doc. 18) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' and Cross Claimant's Joint Motion for Summary Judgment (Rec. Doc. 45) is DENIED.

## BACKGROUND

In October 2005 Defendant Helis Oil and Gas Company, LLC ("Helis") entered into a bareboat charter agreement ("Charter")

with Defendant/Cross Claimant J. Gerber, Inc. ("Gerber") for the use of four hopper barges owned by Plaintiffs River Docks, Inc., Peru Terminal, LLC, and Seneca Petroleum Co., Inc. ("Owners")[1] at the rate of $800 per day. Gerber had separate charter agreements[2] with each of the Owners for their individual vessels at a rate of $600 per day. Owners delivered the barges to Gerber in Peru, Illinois. The parties debate whether Helis took possession of the barges in Peru or in Louisiana. One of the barges, AGS 963, was damaged while en route from Illinois to Louisiana, and Gerber replaced it with Barge CGB 340, owned by River Docks.

Helis intended to use the barges in post-Katrina clean-up operations in the brackish waters of Black Bay in southeastern Louisiana and asserts that Gerber and Owners were aware of this intended use. The barges were damaged by saltwater corrosion while in use by Helis. Defendant Helis alleges that the damage was a result of Owners' or Gerber's failure to apply a coating to protect

---

[1]The barges chartered are AGS 963, owned by River Docks; RMW14, owned by Peru; and H119B and K308B, owned by Seneca. (See Rec. Doc. 15-6 at 24-35, Exhibit E). Note that Defendant Helis refers to AGS 963 as AGS 965 in its opposition memorandum (Rec. Doc. 49), but the contract references the barge as AGS 963. (Rec. Docs. 15-6 at 28, 41-9 at 1).

[2]*Id.* Note that Owners refer to Gerber in various supporting memoranda as a "boat broker" on behalf of owners; however, this term is not used in the Complaint, which references the specific charter agreements with Owners and states that "Gerber became the owner pro hac vice of the barges." (Rec. Doc. 1 at 3-4).

the barges from saltwater. Helis asserts that the barges were so severely damaged that they were no longer reparable and that Gerber subsequently agreed to reduce the daily charter hire on each of the barges from $800 per day to $600 per day. Helis stopped paying charter hire on three of the barges, H119B, K308B, and RMW14, in January and February of 2007, but did not return the barges to Gerber. Helis asserts that its decision to discontinue payment resulted from an agreement by Gerber to cease charging charter hire on those vessels.[3] Helis paid invoices on the fourth barge, CGB 340, through July 2007. In October 2007, disputes arose regarding charter hire allegedly owed for the barges, and Owners sued both Gerber and Helis in January 2008. Owners alleged bad faith breach of contract and asserted a lien on sub-freights, alleging that Owners were third party beneficiaries of the Charter and therefore entitled to recover any amounts owed by Gerber directly from Helis and for physical damage to the barges.

The parties resolved the physical damage claims in the summer of 2008[4] and Helis agreed to pay Owners, collectively, $240,000.

---

[3]It appears that Gerber stopped invoicing for two barges with the January 2007 invoice and began invoicing only one barge in March 2007. Later, in October 2007, Gerber issued invoices for apparent back charter hire on the three vessels.

[4]Parties signed the settlement agreement in June and July of 2008. (Rec. Doc. 15-6 at 1-9).

The 2008 settlement agreement also designated May 15, 2008, as the "latest possible termination date"[5] of the charter. (Rec. Doc. 15-6 at 3). The remaining issues include: 1) whether Owners are parties to any contract with Helis; 2) whether owners are third party beneficiaries to the bareboat charter between Gerber and Helis; 3) the applicability of sub-freight liens; and 4) whether Helis was required to pay charter hire until the barges were repaired or until Helis paid Plaintiffs fair market value for the barges.

Helis's first argument is that Owners are not parties to any contract with Helis. Helis asserts that the Charter contract was only between Helis and Gerber and points to various duties of Helis and Gerber such as Gerber's responsibility to deliver the barges and Helis's obligation to make charter hire payments directly to Gerber, who invoiced Helis. Helis asserts that even though Owners are mentioned in the Charter, mere mention does not make the Owners a party to the Charter. Furthermore, Helis notes, the Owners did not participate in negotiations, did not sign the Charter, and are

---

[5] The provision states, "[T]he parties agree that the latest possible date the Barges will be considered redelivered under the Charter Agreements, if not deemed taken off charter or fair market value having been tendered earlier, is May 15, 2008 ("Latest Possible Termination Date"), and that the claims of the Owners and Gerber shall therefore be limited and altered by the latest Possible Termination Date to the extent applicable."

not individually identified in the Charter. Helis also points to Paragraph two of the First Amendment to Charter Agreement, which states that "J. Gerber and Charterer executed a certain Charter Agreement." (Rec. Doc. 18-5 at 6). Additionally, Helis references the deposition testimony of Joan Gerber and John Adams of J. Gerber, Inc. to support the proposition that the purpose of the Charter was to provide a service and income for Gerber. (See Joan Gerber Deposition at p. 41, ll. 22-25; John Adams Deposition at p. 25, ll. 16-23; Rec. Doc.29-2). Helis asserts that benefits alleged by Plaintiffs "were not the subject of, nor were they the cause of consideration of, the Charter, but instead, were incidental to the primary purpose for which Helis and Gerber entered into the Charter." (Rec. Doc. 29 at 3). Helis also alleges that Gerber "emphasized the exclusivity of its separate and distinct contractual relationships with Helis and Owners and the lack of any contractual privity between Helis and Owners in an email correspondence of October 27, 2007." (Rec. Doc. 15-5 at 3; Exhibit D, Rec. Doc. 15-6 at 22-23). While Helis acknowledges a duty through contract and tort to pay Owners directly if the barges become a total loss, Helis asserts that the contract mandates that Charter Hire be paid only to Gerber and that there is no provision

in the Charter establishing a requirement that Helis pay Charter
Hire directly to Owners.

Helis's second argument is that Owners are not third party
beneficiaries to the Charter. Helis asserts that it did not intend
to confer nor obligate itself to provide any benefit upon Owners,
direct or incidental. Helis further argues that making the Owners
third party beneficiaries of the Charter was not "consideration for
the contract" but that consideration was the use of barges by Helis
in exchange for payment of money to Gerber. Helis also argues that
the fulfillment of Helis's duties under the Charter would not
discharge Gerber's legal obligations to Owners and notes that the
intermediate step of subsequent payment to Owners was required
before the obligations were discharged. Helis asserts that "the
mere act of Helis making payment to Gerber did not guarantee Gerber
would not be held liable to Owners in the future, nor did it secure
an advantage for Owners to benefit Gerber" and that no other "ties
of kinship alleged between Gerber and Owners indicating a benefit
to Owners was intended when Helis entered into the Charter with
Gerber." (Rec. Doc. 15-5 at 9).

Finally, Helis argues that sub-freight liens are inapplicable
in the present case because they can only arise if provided for in

the contract chartering the vessel. *See Lykes Lines Ltd. V. M/V BBC Sealand*, 398 F.3d 319, 323 (5th Cir. 2005). Helis asserts that neither the Charter between Helis and Gerber nor the blanket time charters between Gerber and Owners contain any express provision granting a sub-freight lien on charter hire. Hence, Helis argues sub-freight liens are inapplicable in the present case. Helis further argues that even if a sub-freight lien provision existed in the contract, Owners have not perfected the lien. Helis asserts that "sub-freight liens are traditionally asserted on undisputed amounts owed by a cargo owner to the charterer of a vessel for carriage of goods to satisfy debts of the charterer to the shipowner." (Rec. Doc. 15-5 at 10). *See Chembulk Trading, LLC v. Chemex, Ltd.*, 393 F.3d 550, 554-6 (5th Cir. 2004). Helis argues that there are no freights owed for carriage of cargo in the present case and notes that the charter hire allegedly owed by Helis to Gerber is disputed.

Regarding Owners' and Gerber's Motion for Summary Judgement on Charter Hire, Helis argues that several issues of material fact remain. Helis's main argument is that the parties modified the charter. The first alleged modification was Gerber's reduction of the day rate from $800 to $600. The second alleged modification is

the representation by Gerber that no further charter hire was owed on two of the barges after December 2006 and on the third after January 2007. Helis further asserts that Gerber discontinued invoicing Helis for the three barges. Helis also argues that unresolved questions of fact exist regarding the replacement barge, CGB 340, because there is no written charter agreement referencing that barge. Additionally, Helis presents other facts such as the continuing communication between Gerber and Helis regarding attempts to dry-dock and repair the barges, the determination that the barges were not capable of making a return trip to Illinois, whether Peru was the agreed upon delivery point, and whether Helis's November 20, 2007 offered payment to Gerber and Owners was the fair market value for the barges.[6] Alternatively, Helis argues that Plaintiff Owners are estopped from enforcing the terms of the Charter due to the representations of Gerber. Finally, Helis argues that Owners and Gerber breached their duty to provide seaworthy vessels fit for their intended use by failing to apply a protective coating to the barges.

Owners offer no legal arguments regarding their status as

---

[6]Helis asserts that it tendered to Gerber and Owners $50,000 for each of the barges, plus the scrap value of the barges. Gerber and Owners rejected this tender. (See Rec. Doc. 49 at 6).

parties to the Charter between Helis and Gerber; they merely refute certain facts in the Background section of their opposition. For example, Owners refute Helis's claim that "[t]he contract identifies Gerber and Helis as the only parties to the Charter" by pointing out that "the Owners" appears in the Charter multiple times. (Rec. Doc. 18-3 at 2). Owners similarly oppose Helis's allegation that Helis did not "enter into any agreement or contract with the Owners regarding the charter of the subject barges" by pointing to various Charter provisions articulating obligations by and between Owners and Helis, such as "the obligation of Owners to provide a seaworthy barge." *Id.* Owners offer no argument opposing Defendant Helis's claim that sub-freight liens do not apply. Owners' opposition and cross motion for summary judgment focuses almost exclusively on third party beneficiary status. Owners note that the written contract confers specific remedies to Owners against Helis in the event of Helis's default under the Charter. Contrary to allegations in the Complaint, Owners allege in their opposition memorandum/cross motion for summary judgement that there is no sub-charter in the present case.[7] (See Rec. Doc. 1 at 4;

---

[7]The Court rejects this argument. The charter agreements between Gerber and Owners specifically state that Gerber is the Charterer and that Owners are chartering the barges. These charter

9

Rec. Doc. 18-3 at 7). Owners assert that the benefits conferred on Owners in the Charter are not incidental to the Charter but are "benefits such as performance and remedies that [go] to the very heart of the agreement." (Rec. Doc. 18-3 at 8). Owners also point to Helis's insistence that language requiring Gerber to remit accrued hire to Owners within three days of payment by Helis be included in the Charter.

Alternatively, Owners argue that third party beneficiary status is typically not ripe for summary judgment. Owners assert that there are genuine issues of material fact that preclude summary judgment in Helis's favor on third party beneficiary status, such as Helis's knowledge of Owners' involvement, whether Helis could have reasonably foreseen that Owners relied upon covenants in the Charter, and whether Helis owed any contractual obligation to Owners. Owners cite *Lafayette Ins. Co. v. CMA Dishmachines*, 2005 WL 1038495 (E.D. La. April 26, 2005) to support the legal proposition that "a party's intent is typically an issue of fact that precludes summary judgment." (Rec. Doc 18-3 at 8).

Owners and Gerber assert that Helis is obligated to pay

---

agreements also state in Paragraph 6 that "Owner understands that Charterer intends to sub-charter the Barge(s) to a third party." (Rec. Doc. 15-6 at 26).

charter hire from the inception of the Charter Agreement through May 15, 2008, and argue simply that the language of the Charter obligates Helis to pay charter hire until re-delivery of the repaired barges in Peru, Illinois or until Helis tenders to Owners the fair market value of each barge damaged. Gerber asserts that Helis never delivered the barges to Gerber or Owners by returning the barges to Peru and that the date to be considered tender of fair market value is May 15, 2008, the date set by the parties in the damage settlement agreement as the "Latest Termination Date." Hence, Gerber argues that Charter Hire runs through May 15, 2008.

**DISCUSSION**

**A.   Summary judgment Standard**

Summary judgment is proper if the pleadings, depositions, interrogatory answers, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the

nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986). Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmoving party, the nonmovant must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Assocs. of N. Texas,* 139 F.3d 532, 536 (5th Cir. 1998). The nonmovant must go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to establish a genuine issue. *Id.* Accordingly, conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.* 7 F.3d 1203, 1207 (5th Cir. 1993).

## B. Parties to the Charter

Neither party offers a true analysis of this issue. Owners present no case law on the issue, and Helis cites only *Terrebonne Parish School Board v. Mobil Oil Corp.*, 310 F.3d 870, 887-88 (5th Cir. 2002) for the general proposition that "a party must be in privity of contract with the party alleged to have committed the breach." (Rec. Doc. 15-5 at 5). Although "the Owners" are mentioned in the Charter and the Charter articulates certain rights and responsibilities of the Owners, Owners neither participated in

the negotiations nor signed the Charter. Furthermore, the primary intent of the Charter is the articulation of the charter of four barges by Gerber to Helis. Therefore, Owners are not direct parties to the Charter.

## C. Owners as Third Party Beneficiaries

A charter agreement is a maritime contract whose interpretation is subject to the principles of federal maritime law. *Greenslate v. Tenneco Oil Co.*, 623 F.Supp. 573, 575 (E.D. La. 1985)(*citing Otto Candies, Inc. v. McDermott International, Inc.*, 600 F.Supp. 1334, 1335 (E.D. La. 1985)). The analysis of third party beneficiaries appears to be the same under both federal maritime and Louisiana law, and the parties reference both in their motions and memoranda. *See Branch v. Art Catering, Inc.*, 2007 WL 1747023 (E.D. La. 2007). Both Louisiana and federal maritime law recognize the validity of third-party beneficiary status, and as recognized in *Branch v. Art Catering, Inc.,* "[b]oth sets of law require that the contracting parties manifest an intent to benefit the third party." *Id*. at *1 (*citing Greenslate v. Tenneco Oil Co.*, 623 F. Supp. 573, 576 (E.D. La. 1985); La. Civ. Code Ann. art. 1978; and *Concept Design, Inc. v. J.J. Krebs & Sons*, 96-1295 (La. App. 4 Cir. 3/19/97); 692 So. 2d 1203, 1205-06 ("in order to

13

establish a *stipulation pour autrui* there must be a clear expression of intent to benefit the third party").

In Louisiana, contracts for the benefit of a third party are governed by Article 1978 of the Louisiana Civil Code. Under Louisiana law, there are three factors for determining whether a contract provides benefits to a third party: (1) The stipulation for a third party must be manifestly clear; (2) There must be certainty as to the benefit owed the third party; and (3) The benefit must not be a mere incident of the contract between the promisor and the promisee. *Joseph v. Hosp. Serv. Dist. No. 2 of the Parish of St. Mary*, 939 So. 2d 1206, 1212 (La. 2006). The benefit to the third party must be a direct benefit, and the contract must clearly provide that the direct benefit to the third party forms the condition or consideration of the contract. *Liquid Drill, Inc. v. U.S. Turnkey Exploration, Inc.*, 48 F.3d 927, 931 (5th Cir. 1995); *see also Atlantic & Gulf Stevedores, Inc. v. Revelle Shipping Agency, Inc.*, 750 F.2d 457, 459 n.3 (5th Cir. 1985)(holding that "a promise must be made directly for the benefit of a third party to support a claim by that third party under the contract"). "A consideration is ... the reason, motive, or inducement, by which a man is moved to bind himself by an

agreement." John Salmond, *Jurisprudence* 359 (Glanville L. Williams ed., 10th ed. 1947). A clear manifestation to benefit the third party may be implied from consideration of the whole contract in light of the surrounding circumstances. *Merco Mfg., Inc. v. J.P. McMichael Constr. Co.,* 372 F. Supp. 967, 971 (W.D.La. 1974). However, "not every promise for the benefit of a third party...will create in the third party an actionable right." *Liquid Drill, Inc. v. U.S. Turnkey Exploration, Inc.*, 48 F.3d 927, 931 (5th Cir. 1995)(stating also that "[t]he existence of a *stipulation pour autrui* depends on the intention to create it" and noting that "[p]eople usually stipulate for themselves, not for third persons").

Defendant Helis argues that neither intent nor direct benefit are met in the present case. Specifically, Helis argues that it did not intend to confer any benefit upon Owners, direct or incidental. Helis also argues that performance by Helis did not discharge Gerber's legal obligation to Owners.[8] The parties focus on *Bunge Corp. v. M/V Furness Bridge*, 390 F.Supp. 603 (E.D. La.

---

[8]Helis also argues that it was not aware of a legal relationship between Gerber and Owners at the time of execution of the Charter. However, Paragraph 1 of the Charter states that Gerber has the authority and consent of the Owners to charter the Barges. This evidences that Helis knew or should have known of a legal relationship between Gerber and Owners.

1974) and *Liquid Drill, Inc. v. U.S. Turnkey Exploration, Inc.*, 48
F.3d 927 (5th Cir. 1995).

Like the present case, *Bunge* involved a charter by the owner
and a subsequent sub-charter.  While the vessel was being operated
under the sub-charter by the owner's crew, the vessel struck a dock
owned by the sub-charterer.  The sub-charterer sued the owners for
negligence.  Both charters contained safe berth and arbitration
clauses, and the owners argued that the sub-charterers owed a duty
to furnish a safe berth and that the issue was properly a matter
for arbitration pursuant to the charter agreements.  *Bunge*, 390
F.Supp. at 603-04.  Noting that the sub-contractor did not
undertake an obligation to the owner concerning a safe berth or
agree to arbitrate any dispute with the owner, the *Bunge* court
found that the owner was neither a party to nor a third party
beneficiary of the sub-charter. *Id*. at 604.

*Liquid Drill* involved a drilling contract in which a sub-
contractor sued the contractor and the company, PSI, the assignee
of the oil well operator that hired the contractor, for non-
payment.  PSI, though unsatisfied with the job of the contractor,
paid the contractor an amount determined at arbitration.  The
contractor did not use a portion of the arbitration award to pay

the sub-contractor. The sub-contractor contracted only with the contractor. The contractor filed for bankruptcy, and the sub-contractor sought direct compensation against PSI. The Fifth Circuit affirmed the District Court's grant of summary judgment in favor of PSI, finding that the sub-contractor was not a third party beneficiary of the contract between PSI and the contractor. *Id*. at 933. The court's analysis focused on express stipulation of a benefit to a third party and an incidental benefit. The court referenced factors adopted by the Louisiana Supreme Court and outlined by Professor J. Denson Smith:

> (1) the existence of a legal relationship between the promisee and the third person involving an obligation owed by the promisee to the beneficiary which performance of the promise will discharge; (2) the existence of a factual relationship between the promisee and the third person, where (a) there is a possibility of future liability either personal or real on the part of the promisee to the beneficiary against which performance of the ... [promisor] will protect the former; (b) securing an advantage for the third person may beneficially affect the promisee in a material way; © there are ties of kinship or other circumstances indicating that a benefit by way of gratuity was intended.

*Id*. at 931 (citing 11 Tul.L.Rev. 18, 58 (1936), and *Dartex v. Dixon*, 502 So.2d 1063, 1065 (La. 1987)); *see also Leavell & Co. v. Glantz Contracting Corp.*, 322 F.Supp. 779, 784 (E.D. La. 1971)(citing Professor Smith's factors).

The Fifth Circuit found that the contract between PSI and the contractor did not create a *stipulation pour autrui* because the contract neither expressed an intent to contract for the benefit of the sub-contractor nor contemplated conferring a benefit on the sub-contractor as its condition or consideration. *Id.* at 933. Additionally the court found the benefit relied upon by the sub-contractor was merely incidental of the agreement between PSI and the contractor. *Id.* The court noted that "PSI's payment to [contractor] may have facilitated [contractor's] ability to pay its subcontractors, but that is insufficient to create a *stipulation pour autrui* in favor of the plaintiffs." *Id*.

Owners criticize reliance upon these two cases cited by Helis because they do not address "a contract wherein the third party is identified, bestowed rights and given responsibilities." (Rec. Doc. 18-3 at 7). However, Owners also fail to provide an in-depth analysis of such a case. This Court has considered cases involving contracts that identify the third party and bestow rights. The third party's right to enforce a right articulated in a contract to which it is not a party is limited to the particular benefit intended to be bestowed by that particular promise. For example, *Greenslate v. Tenneco Oil Co.* involved an indemnity agreement

between owner and charterer that specifically stated that owner agreed to "indemnify ... Charterer...its subsidiary and affiliate companies" and other parties. 623 F.Supp. at 574. The Court found this specific promise between promisor and third party conferred the benefit of indemnity upon the plaintiff subsidiary and held that the subsidiary was a third party beneficiary and could enforce the indemnification provision. *Id*. at 576.

This limiting principle is also illustrated in cases involving insurance procured by a mortgage company when a mortgagor has failed to procure homeowner's insurance. In *Graphia v. Balboa,* 2007 WL 2903250 (E.D. La. 2007), the borrower plaintiff argued that she was a third party beneficiary of a lender-based policy. The policy in that case stated that plaintiff was considered an additional insured with respect to additional amounts over and above the mortgage company's insurable interest. *Id*. at *3. The court rejected the plaintiff's third party beneficiary claim, finding that the contract "evidenced no intent to give plaintiff personal rights in the insurance coverage <u>for losses that do not exceed the mortgagee's insurable interest</u>." *Id*. at *4 (emphasis added).

Similarly, in *Verhoeven v. Balboa Insurance Company*, Civil Action 06-4891, 2007 WL 4374222, *5 (E.D. La. 2007), this Court

held that the homeowner, though a beneficiary if the loss exceeded the mortgage, was not a third party beneficiary to the policy and found that "the fact that the Plaintiff was responsible for reimbursing [mortagee] for the premiums does not automatically make him a third party beneficiary under the policy." *(Citing Kilson v. Am. Road Ins. Co.*, 345 So. 2d 967, 969 (La. App. 2d Cir. 1977)(holding that although lienholder charged borrower for insurance premiums paid by lienholder, this fact did not make borrower a third party beneficiary of the contract between lienholder and insurance company)). *See also Leavell*, 322 F.Supp. 779 (finding, in general contractor's suit against architect, that general contractor was not a third party beneficiary to the contract between architect and the owner even though the contractor was referenced in the architect's contract with the owner and the architect was referenced in the contractor's contract with the owner).

Owners in the present case are not third party beneficiaries to the Charter between Gerber and Helis, at least not for the promise of payment of charter hire, which is the main consideration of the contract. The stipulation alleged is not clear and there is no certainty as to the benefit of charter hire payment from Helis

to Owners.  Finally, any benefit to Owners with respect to charter hire paid by Helis is merely incidental to the contract and does not form the consideration of the contract.  The consideration of the contract, i.e. "the reason, motive, or inducement" for the agreement is the charter of barges by Gerber to Helis in exchange for Helis's payment of charter hire to Gerber.  The beginning paragraph of the Charter confirms Gerber's agreement to charter the four barges and mandates that Helis make all payments of charter hire to Gerber.  (Rec. Doc. 15-6 at 11-12).  The Charter goes on to describe terms, rights, and responsibilities incident to that purpose of chartering the barges.  Furthermore, Joan Gerber states in her deposition testimony that Gerber's purpose was to sub-charter the barges to Helis.  (Rec. Doc. 29-2 at  7, 8).  Joan Gerber also testified that Helis contacted Gerber first about its need and then Gerber "went out and found barges to fulfill the need." *Id*. at 8.  Also of note is the fact that the Charter between Gerber and Helis was signed before at least two of Gerber's contracts with Owners.  (See Rec. Doc. 15-6 at 24-35).  Additionally, Helis has steadfastly stated that its purpose was to charter barges for use in Katrina clean-up.

Although the Charter mentions Owners multiple times[9] and

---

[9]The Charter refers to the Owners in the following instances:

1.      Gerber "represents that it has authority and consent from the owners
        ... to charter the Barges pursuant to the terms of **this** Charter and
        that the Owners, if requested, will confirm such authority in
        writing."  (Charter ¶ 1)(emphasis added).

2.      "At the time of delivery, the Owners will arrange to have a marine
        surveyor mutually acceptable to both parties inspect the barges and
        prepare a written survey (the "On-Charter Survey") to document their
        condition.  J. Gerber, Inc. Or Owners will pay for the cost of the
        on-Charter Survey." *Id.*

3.      Gerber "will pay to Owners the monies (i.e. per day of Charter Hire)
        for each barge within three (3) days of receiving the Charter Hire
        from Charterer."

4.      Multiple references to Owners and Gerber/Owners in Paragraph 5 of
        the Charter on insurance, including:
        • an alternate employer endorsement in favor of Owner
        • Gerber/Owners shall be named as additional assured
        • underwriters who are reasonably acceptable to Gerber/Owners
        • waiver of subrogation against Gerber/Owners, as respects risks
          assumed by Charter
        • Gerber/Owners be given 30 days advance written notice before
          any cancellation becomes effective
        • Gerber/Owners shall be provided with a certificate of
          insurance

5.      Owner understands that Charterer does not intend to sub-charter the
        Barges to a third party.  *Id.* at ¶ 8.   Paragraph 8 contains
        additional references to Owners; however the paragraph taken as a
        whole is ambiguous and is discussed in more detail later in this
        order.

Appendix A references

1.      Gerber, Owners, and Charter "agree to each maintain their
        eligibility under law to own/operate respectively barges in the
        trade for which the Barges will be used."  (Rec. Doc. 15-6 at 13)

2.      Excluding income taxes owed by Owners from the taxes Charterer is
        responsible for.  (Rec. Doc. 15-6 at 14).

3.      Gerber/Owners have used due diligence to ensure that each Barge is
        and shall be at the time of its delivery to Charterer staunch,
        strong and in all respects seaworthy and in good repair and running
        condition . . . ." Id.

4.      Charterer understands and agrees that after accepting delivery of
        the Barge(s) at the Delivery Location, it may not thereafter make
        any claim against Gerber/Owner seeking damages ... indemnity or
        otherwise arising out of or in any way related to the condition of
        the Barge(s)...."

5.      In the event of a total or constructive total loss of the Barge(s),
        Charter Hire shall continue until Charterer pays Owners the fair
        market value of each barge damaged or lost as stated in the Charter.

6.      Gerber/Owner "agrees to hold harmless, indemnify and defend

conveys some rights and responsibilities to Owners, those rights
are incidental to the purpose of chartering the barges to Helis and
Helis's promise to  pay charter hire to Gerber.  For example, the
responsibilities of Owners to arrange for the surveyor, pay for the
on-Charter survey, and maintain legal eligibility to own the barges
and Helis's responsibilities to procure insurance naming Owners as
additional assureds, are incidental to the Charter and its primary
promise and purpose to charter barges in exchange for charter hire.
The Charter does grant certain other specific rights to Owners,
such as direct payment for total loss and the rights conferred
under Appendix A that enable Owners to recover interest on any
unpaid sum[10] and to recover legal costs expended to enforce <u>Gerber's</u>

Charterer from all claims, ... arising from or relating to the
operation or activities of the Barge(s) at any time prior to
delivery, or after the Barge(s) is/are returned to Gerber/Owner...."
7.     Charterer agrees to hold harmless, indemnify and defend Gerber/Owner
from all claims, ...arising from or relating to the operation or
activities of the Barge(s) at any time after delivery and prior to
return of the Barge(s) to Gerber/Owner..."
8.     If Charterer should default in its obligations under this charter,
Gerber/Owners may in addition to other legal remedies (a) recover
interest on any unpaid sum at the rate of 1-1/2% per month until
fully paid, and (b) recover all legal costs including attorney fee
incurred  to enforce J. Gerber, Inc.'s rights under this charter.
*Id.* at 14-15.

[10]The last paragraph of Appendix A states:
Charterer shall not subcharter the Barge(s) to others without the
consent of [Gerber] which consent shall not be unreasonably
withheld.  In the event of a subcharter, Charterer shall remain
responsible to [Gerber] for all obligations under this Charter.  If
Charterer should default in its obligations under this charter,

<u>rights</u>, not Owners' rights, under the Charter. However, these
provisions are limited provisions similar to specific indemnity
provisions or limited insurance provisions providing for payment to
the mortgagor for amounts over and above the mortgage company's
insurable interest. This right neither "expresses an intent to
contract for the benefit of [Owners]" nor confers a benefit on
Owners as the condition or consideration of the Charter. *Liquid
Drill*, 48 F.3d at 932-33.

The Charter also evidences some ambiguities that constitute
additional evidence that the stipulation is not "manifestly clear"
and casts doubt on the "certainty as to the benefit owed the third
party." *Joseph*, 939 So. 2d 1206. One of the most such ambiguous
provisions is Paragraph 8 of the Charter, which states:

> Owner understands that Charterer does not intend to sub-
> charter the Barges to a third party. We have agreed that
> before entering into any such sub-charter, Charterer will
> ensure the written sub-charter agreement (a) requires the
> subcharterer to comply with all obligations that this
> Charter places on the Charterer, and (b) includes a
> statement to the effect that Owner is an intended third-
> party beneficiary of all such obligations. Charterer
> also agrees to send a copy of the written sub-charter

---

[Gerber]/Owners may in addition to other legal remedies (a) recover
interest on any unpaid sum at the rate of 1-1/2% per month until
fully paid, and (b) recover all legal costs including attorney fee
incurred to enforce J. Gerber, Inc.'s rights under this charter.
*Id*. at 14-15.

agreement to Owner for approval before entering into such
sub-charter.

Paragraph 8 may have been Gerber's attempt to fulfill its
obligation under Paragraph 6 of its various charter agreements with
Owners, which require that the sub-charter agreement, i.e. the
Charter between Gerber and Helis, contains language ensuring
compliance with all obligations that the Gerber-Owner charter
places on Gerber and includes a statement that Owner is a third
party beneficiary. (Rec. Doc. 15-6 at 24-35). However, Paragraph
8 of the Gerber-Helis Charter, which is the first sub-charter of
the barges, describes conditions for a second sub-charter in the
event Helis sub-charters the barges.

Additionally, the first condition of Professor Smith
referenced in *Liquid Drill* , the existence of a legal relationship
between the promisee and the third person involving an obligation
owed by the promisee to the beneficiary which performance of the
promise will discharge is not met. Gerber and the Owners have
legal relationships that mandate that Gerber pay Owners charter
hire at a rate of $600 per day. However, just as payment by PSI to
the contractor may have facilitated the contractor's duty to pay
the subcontractor in *Liquid Drill,* Helis's payment to Gerber only
facilitates Gerber's ability to meet its obligations to Owners; it

does not automatically discharge Gerber's obligation to Owners. 48 F.3d at 933.

The only party owing a duty to pay charter hire to Owners is Gerber, as indicated in the charter agreements Gerber has with each individual Owner. It appears that Gerber may not have complied with certain provisions of its charter agreements with Owners, such as the provision that Gerber ensure the sub-charter with Helis contain provisions requiring the sub-charterer to comply with all obligations the Gerber-Owner charters placed on Gerber and a statement that Owners are third party beneficiaries to the sub-charter. Such noncompliance effectively usurped Owners' intent to be third party beneficiaries to the Gerber-Helis Charter. Helis, unaware of Owners' intent that such provisions be included, likely did not intend to provide such benefits when entering into the Charter agreement with Gerber. Hence, Gerber, not Helis, is the only party against whom Owners can recover unpaid charter hire. As such, the Court finds that Owners are not third party beneficiaries to the Charter between Gerber and Helis.[11]

---

[11] The Court rejects Owners' alternative argument that third party beneficiary status is not ripe for summary judgment in the present case. As evidenced by the several cases discussed, courts have often found third party beneficiary status ripe for summary judgement and have often granted such summary judgement motions or dismissed parties or claims upon a finding of no third party beneficiary status. Additionally, the facts evidencing the intent of the parties

## D.  Sub-freight liens

Shipowners, as a general rule, have a lien upon the cargo owned by the charterer for compensation not yet paid.  *Chembulk Trading LLC v. Chemex, Ltd.,* 393 F.3d 550, 554 (5th Cir. 2004) *(citing Lykes Lines Ltd. v. M/V BBC Sealand*, 398 F.3d 319 (5th Cir. 2005)).  The charter between the shipowner and the charterer, however, may provide for a lien on any freights owed by the cargo owner to the charterer.  *Id.*  Two general conditions are necessary for a shipowner to maintain a lien against such a third person.  First, the shipowner must have a contractual right to assert the lien; second, the shipowner must properly perfect the lien.  *Id.* (*citing Biehl & Co., Inc. v. Apollonia Holding, Inc.,* 693 F.Supp. 457, 465 (E.D.La.1988); *accord Toro Shipping Corp. v. Bacon-McMillan Veneer Mfg. Co.,* 364 F.2d 928, 930 (5th Cir.1966)). A shipowner's contractual right to assert a lien against freight owed by a third party arises by an *express provision* in the charter party granting the shipowner a lien on such freight.  *Id.* at 555. The lien provision, as it appears in most form charters, is usually phrased as: "the owners [meaning the owners of the vessel] shall

---

are not disputed.  This is apparent in the language of the contract and pleadings and the evidence presented, including deposition testimony, invoices, and emails.

have a lien upon all cargoes and all subfreight for charter money due under this charter." *Id*.

An express provision granting the shipowner a sub-freight lien is present in neither the Charter between Helis and Gerber nor any of the charter agreements between Gerber and Owners.  Additionally, Plaintiffs offer no arguments on this point.  Accordingly, the Court finds that sub-freight liens are inapplicable in the present case.

**E.  Term of Charter Hire**

In their Motion for Summary Judgment on Charter Hire, Owners and Gerber assert that Helis is obligated to pay charter hire from the inception of the Charter Agreement through May 15, 2008, and argue simply that the language of the Charter obligates Helis to pay charter hire until re-delivery of the repaired barges in Peru, Illinois or until Helis tenders to Owners the fair market value of each barge damaged.  Owners and Gerber rely upon *Otto Candies, Inc. v. McDermott Int'l, Inc.*, 600 F. Supp. 1334, 1344 (E.D. La. 1985), *aff'd*, 785 F.2d 1033 (5th Cir. 1986), a case in which the court found the charterer liable under the terms of the charter for unpaid charter hire that accrued until the date the barges were repaired and approved for service.

As stated in the section of this order on third party beneficiaries, a charter agreement is a maritime contract whose interpretation is subject to the principles of federal maritime law. *Greenslate v. Tenneco Oil Co.*, 623 F.Supp. 573, 575 (E.D. La. 1985); *see also Atlantic Lines, Ltd. v. Narwhal, Ltd.*, 514 F.2d 726, 731 (5th Cir. 1975). Charter parties are to be construed in accordance with general principles of contractual construction. *Otto Candies,* 600 F. Supp. at 1339. Those who enter into a contract may by mutual agreement rescind or alter it. *West India Industries, Inc. v. Tradex Petroleum Services*, 664 F.2d 946, 949 (5th Cir. 1981). Alteration, modification, or waiver of contract provisions may be implied from the acts and circumstances surrounding the performance of such contract. *Stauffer Chemical Co. v. Brunson*, 380 F.2d 174, 182 (5th Cir. 1967).

Helis argues that the terms of the Charter were changed and presents supporting evidence of such modifications. *Otto Candies*, the case relied upon by Owners and Gerber, does not involve contract modifications. Helis argues that the Charter terms changed when Gerber reduced the charter hire rate from $800 per day to $600 per day and later when Gerber notified Helis that no charter hire was owed on three of the barges and discontinued invoicing Helis for

those barges. In support Helis provides invoices indicating the rate change[12] and later exclusion of three barges from the invoices. (Opposition of Helis, Ex. 14, Rec. Doc. 49-5 at 6-17). Helis also supports its allegation of modified Charter with email correspondence and deposition testimony. *See id.*, Exs. 16, 21, 23, 24. For example, the deposition testimony of John Derrick, a representative of Helis, and an email from Joan Gerber seem to indicate that some of the barges had been released from the Charter and that Derrick understood this to mean that the barges were off charter. (*See id.*, Exs. 21, 23, 24, Rec. Doc. 49-5 at 76-78 (deposition of Derrick); *id.* at 85, 87-90(email correspondence from Joan Gerber). Helis presents strong evidence that the Charter was modified by Gerber, which at the least indicates the existence of genuine issues of material fact. Hence summary judgment is not appropriate on the issue of charter hire at this time.

Accordingly,

**IT IS ORDERED** that Defendant Helis's Motion for Summary Judgment (Rec. Doc. 15) is **GRANTED** and that Plaintiffs' Cross Motion for Summary Judgment (Rec. Doc. 18) is **DENIED**.

---

[12]The 9/1/2006 invoice states, "Please note new lower charter rates as per Ken Perroti and Myself will be reflected next month billing" and indicates a charge of $24,266.67 for each barge. The 11/1/2005 invoice shows a reduced charge of $18,200 for each barge for the month.

**IT IS FURTHER ORDERED** that Plaintiffs' and Cross Claimant's Joint Motion for Summary Judgment (Rec. Doc. 45) is **DENIED**.

New Orleans, Louisiana this 25th day of February, 2009.

_____
                    IVAN L.R. LEMELLE
                  UNITED STATES DISTRICT JUDGE